Faith DUPRE, Plaintiff–Appellant,

v.

ALLSTATE INSURANCE COMPANY, Defendant–Appellee.

No. 01CA0630.

Colorado Court of Appeals, Div. III.

June 6, 2002.

Certiorari Denied Feb. 10, 2003.

Elder & Phillips, P.C., Keith Boughton, Grand Junction, Colorado, for Plaintiff–Appellant.

Harris, Karstaedt, Jamison & Powers, P.C., Susan M. Stamm, Englewood, Colorado, for Defendant–Appellee.

Opinion by Judge DAVIDSON.

In this fire insurance case, plaintiff, Faith Dupre, appeals from the trial court judgment determining that the policy on her house issued by defendant, Allstate Insurance Company, precluded coverage for the increased cost of repairs to comply with current building codes. We reverse and remand.

In January 1997, plaintiff purchased an insurance policy with a limit of $100,431 on a ninety-one-year-old house. The house was used as a rental property, but plaintiff planned to occupy it herself beginning sometime in 1998. In September 1997, a fire in the enclosed rear porch caused smoke and fire damage to portions of the house. The tenants apparently had vacated the house some days before the fire.

Defendant's adjuster contacted a builder, who quoted an estimated cost of $60,680.68 to repair the house to its prefire condition. Plaintiff and defendant's claims representative "talked through" calculations based on the estimate and policy coverage, and based on those calculations, plaintiff submitted a proof of loss for $60,932.30 in November 1997. Applying deductions for depreciation, defendant paid plaintiff $36,493.95, representing the "actual cash value" of plaintiff's losses. Defendant withheld the amount representing depreciation pending actual repair

or replacement of the damaged portions of the house.

In December 1997, an employee of the Mesa County Building Department and a representative of the builder providing the repair estimate conducted a walk-through of the premises. Several areas were identified in which the house did not comply with current building codes. These areas were categorized as either "fire damage—required code up date" or "non-permitted construction." Examples in the former category were items such as altering the width, pitch, and span rise of the staircase; installing top plates on bearing walls; providing egress from bedrooms damaged by fire; replacing 1x4s with 2x4s in the burned walls; bringing the burned portions of the roof up to code; and bringing all wiring in the area up to code. In the non-permitted construction category were items such as removal of the closed-in porch or bringing it up to code and replacing part of the foundation wall, which had been knocked out to allow access to the sewer line.

Plaintiff was informed that, to receive the necessary permits, any repairs would need to comply with the building codes and that she would not be permitted merely to restore the damaged parts of her house to their former specifications. Plaintiff had filed her proof of loss before she was aware of the upgrade issues, and she notified defendant in December 1997 of the required upgrades. Defendant informed her that there was no coverage for code upgrades. Plaintiff received the same response after she mailed the report of required upgrades to defendant in January 1998.

In May 1998, plaintiff decided to purchase a modular home to place on the property rather than rebuild the damaged house to code at her own expense. The purchase price of the modular home was $47,733.22, and plaintiff informed defendant that additional expenditures were necessary to install the home. Defendant paid plaintiff the $23,932.35 it had been holding for depreciation and for the costs of boarding up the damaged house, which was later condemned. Plaintiff's insurance agent called defendant approximately one week later to relay plaintiff's concerns that she should receive additional compensation, and defendant informed the agent that the policy did not cover building code upgrades.

Subsequently, plaintiff hired an attorney. She questioned defendant's payment calculations, alleging that the policy required defendant to pay the cost of bringing the damaged house up to code because the need for such repairs was caused directly by the fire. Plaintiff made a demand for payment in the amount of the policy limit, which defendant refused, and plaintiff then brought this action for breach of contract and bad faith breach of insurance contract.

Defendant moved for summary judgment, arguing that the policy unambiguously excludes coverage for required building code upgrades and provides only for the cost of returning the house to its prefire condition, building code violations notwithstanding. Plaintiff filed a cross-motion for partial summary judgment, arguing that the house was a total loss because she would not be permitted to occupy it if it were repaired to its prior condition or, alternatively, that the policy language was ambiguous and should be construed in favor of coverage. The trial court agreed with defendant and granted summary judgment.

A party is entitled to summary judgment only upon demonstrating that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. *See* C.R.C.P. 56(c); *Churchey v. Adolph Coors Co.*, 759 P.2d 1336 (Colo.1988). Review of a grant of summary judgment is de novo. *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.*, 901 P.2d 1251 (Colo.1995).

Interpretation of an insurance policy is also a question of law that is subject to de novo review, and policy language should be enforced as written if it is unambiguous. *See Hyden v. Farmers Ins. Exch.*, 20 P.3d 1222 (Colo.App.2000). Language is ambiguous if it is susceptible of more than one reasonable interpretation, and if the policy language is ambiguous or inconsistent, it must be construed against the insurer and in

favor of coverage. *See Union Ins. Co. v. Houtz*, 883 P.2d 1057 (Colo.1994).

■ "Exclusionary language that conflicts with the objectively reasonable expectations of the insured is not enforceable, even if a 'painstaking study of the policy provisions would have negated those expectations.' " *Tepe v. Rocky Mountain Hosp. & Med. Servs.*, 893 P.2d 1323, 1328 (Colo.App.1994)(quoting *State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 168 (Colo.1993)). *See also Am. Family Mut. Ins. Co. v. Johnson*, 816 P.2d 952, 953 (Colo.1991)("Exclusionary clauses designed to insulate particular conduct from general liability coverage provisions must be drafted in clear and specific language."). However, the doctrine of reasonable expectations will be applied only if the contract is ambiguous. *See Pub. Serv. Co. v. Wallis & Cos.*, 986 P.2d 924 (Colo.1999); *Spaur v. Allstate Ins. Co.*, 942 P.2d 1261, 1265 (Colo.App.1996)("[t]he doctrine of reasonable expectations supplements, but does not substitute for, the rule that insurance policies are to be considered according to well-settled principles of contract construction," and insured has duty to read policy).

The declarations page of plaintiff's policy indicates that she had special form coverage. The provision of the policy describing that type of coverage states: "We will pay for direct loss to the property described in the Dwelling Protection coverage ... from all risks of physical loss. Specific limitations and exclusions, including any deductible shown on the declarations page, will apply."

The General Exclusions portion of the policy provides, inter alia:

> We do not cover loss or damage resulting directly or indirectly from: ... Enforcement of any ordinance or law regulating the construction, repair or demolition of dwellings. If the loss is caused by actions of a civil authority to prevent the spread of fire, we will provide coverage unless the cause of the fire loss is specifically excluded.

Under the payment provisions of the policy and an amendatory endorsement, if the insured does not repair or replace the damaged property, a deduction for depreciation will be subtracted from the amount of the loss to determine the "actual cash value." The amount to be paid for "actual cash value" is limited to the lesser of the policy limit or "the amount necessary to repair or replace the damaged property with equivalent construction for similar use on the same property."

If the insured does repair or replace the damaged property, the policy and endorsement provide for "replacement cost" coverage: "This means the cost to repair, rebuild or replace the damaged or destroyed part(s) of the building(s) without deduction for depreciation" in an amount not to exceed the smaller of the policy limit, the "replacement cost of the part(s) of the building(s) damaged or destroyed for equivalent construction for similar use on the same premises," or the actual amount expended to repair or replace the property with "equivalent construction for similar use on the same premises."

## I.

■ We first reject defendant's contention that plaintiff's contract action is barred by the language of the policy providing, "No suit or actions may be brought against [insurer] unless there has been full compliance with all the terms of this policy. Any suit or action must be brought within one year after the loss." This argument was raised in the trial court, but was not referenced in the trial court's order, which implicitly ruled that plaintiff's action could be considered on the merits. Presumably, the trial court accepted plaintiff's contention that material questions of fact remained as to whether defendant should be estopped by its actions from relying on the one-year limitations period. We find no error.

Initially, we note that the limitations provision is applicable, if at all, only to the contract action and not to the bad faith tort action. *See Emenyonu v. State Farm Fire & Cas. Co.*, 885 P.2d 320 (Colo.App.1994).

■ Additionally, the duty of good faith owed by the insurer to the insured requires that it not act to prevent the occurrence of conditions to its performance. *See Navajo*

*Freight Lines, Inc. v. Moore,* 170 Colo. 539, 543, 463 P.2d 460, 462 (1970)("it is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance of a condition upon which his own liability depends, he cannot take advantage of that failure"); *see also* Restatement (Second) Contracts § 245 cmt. a (1981)("Where a duty of one party is subject to the occurrence of a condition, the additional duty of good faith and fair dealing ... may require some cooperation on his part, either by refraining from conduct that will prevent or hinder the occurrence of that condition or by taking affirmative steps to cause its occurrence."); *cf. Strader v. Beneficial Fin. Co.,* 191 Colo. 206, 551 P.2d 720 (1976)(where a party's acts or omissions contribute to the running of a statute of limitations, the party may be prevented from raising that defense by the doctrine of equitable estoppel).

Plaintiff alleges that defendant interfered with her ability to timely file suit by, inter alia, withholding a complete copy of her policy. Specifically, she alleges that, despite repeated requests for a copy of her policy made before the expiration of the limitations period, a partial copy of the policy was not provided until July 20, 1998, and omitted endorsements were not provided until March 18, 1999, well after the one-year period expired. Defendant contends that it should not be estopped because plaintiff received a complete copy of the policy prior to the fire and because missing endorsements did not pertain to the coverage issues here.

Thus, whether defendant's actions hindered the fulfillment of the limitations condition remains an unresolved question of fact, and, therefore, at this stage of the proceedings, defendant is not entitled to summary judgment on those grounds.

## II.

As a threshold matter, we note that in its motion for summary judgment, defendant relied primarily on the exclusion for enforcement of building laws to justify its denial of coverage for the cost of upgrades. However, in the briefs it later filed, defendant relied on policy language limiting replacement cost to "equivalent construction for similar use" as an additional basis for denying increased repair costs. The trial court denied plaintiff's motion to strike the latter argument and, on appeal, plaintiff does not challenge that ruling. Therefore, we consider and reject both grounds for denying coverage.

## A.

■ According to defendant, the exclusion for "[e]nforcement of any ordinance or law regulating the construction, repair or demolition of dwellings" precludes coverage for required building code upgrades. We disagree.

■ An exclusion is "[a]n insurance policy provision that excepts certain events or conditions from coverage." *Black's Law Dictionary* 585–86 (7th ed.1999). An exclusion is unnecessary unless the excluded event would otherwise fall within the coverage provisions. *See Betco Scaffolds Co. v. Houston United Cas. Ins. Co.,* 29 S.W.3d 341 (Tex.App.2000); *see also Am. & Foreign Ins. Co. v. Colonial Mortgage Co.,* 936 F.2d 1162, 1169 (11th Cir. 1991)(Hatchett, J., concurring)("The essential purpose of an exclusion is to limit the scope of coverage granted in the coverage section of the policy.").

Plaintiff's policy provides that coverage is available for direct loss caused by all risks of "physical loss." Accordingly, by its plain language, and contrary to defendant's contention, the exclusion applies only to "physical loss" caused by enforcement of building laws.

We note that similar exclusions historically have been applied when code enforcement or government order has resulted in physical damage. *See Hawaii Land Co. v. Lion Fire Ins. Co.,* 13 Haw. 164 (1900)(board of health ordered burning of buildings to combat plague, and fire spread to insured's buildings); *Sweeney v. City of Shreveport,* 584 So.2d 1248 (La.Ct.App.1991)(house demolished by city pursuant to ordinance after complaints received regarding its condition and use as a "drug house"); *Hocking v. British Am. Assurance Co.,* 62 Wash. 73, 113 P. 259 (1911)(insured's house burned after city ordered fumigation, and negligence of the health officer started fire).

Here, there was no "physical loss" caused by the building code requirements, and, therefore, we conclude that the exclusion is inapplicable.

## B.

Plaintiff contends that the trial court erred in concluding that the replacement cost limitation for "equivalent construction for similar use" is unambiguous and precludes coverage for the cost of upgrading the fire damaged parts of her house to comply with current building codes. We agree.

In its order granting summary judgment to defendant, the trial court noted that "[o]ne of the traditional concepts of fire insurance is to indemnify or compensate the insured for the actual loss sustained, and not to place the insured in a better position than he or she was in at the time of the fire," citing *Bischel v. Fire Insurance Exchange*, 1 Cal.App.4th 1168, 2 Cal.Rptr.2d 575 (1991), and *Breshears v. Indiana Lumbermens Mutual Insurance Co.*, 256 Cal.App.2d 245, 63 Cal.Rptr. 879 (1967). The trial court reasoned that replacing plaintiff's noncomplying structure with one that complied with current building codes would compensate plaintiff for expenditures she had never made and would put her in a better position than she had been in prior to the fire.

Taking this reasoning into account when applying the common definition of the terms to the facts, the court concluded that:

> "equivalent construction for similar use" does not require the insurer to pay for structural improvements or code upgrades which were not in existence in the building at the time of the fire despite the fact that any new construction must conform to current building codes. "Equivalent construction for similar use" requires replacement with construction equal or like in value or worth to that which was destroyed or damaged for a use nearly corresponding or resembling in many respects the pre-fire use (i.e., in this case a house which, although it was inhabited, did not conform to current building codes).

Plaintiff contends that interpreting the policy language to include the cost of building code upgrades does not conflict with the principle of not putting an insured in a better position than he or she was in before the fire and that the provision can reasonably be interpreted to include the cost of returning the dwelling to its equivalent or similar use as a habitable structure. We agree with both contentions.

### 1.

An insured who does not rebuild or repair is generally entitled only to the actual value of the loss, and payment of additional amounts representing a higher cost to replace the structure would be an impermissible windfall. *See State Ins. Co. v. Taylor*, 14 Colo. 499, 511, 24 P. 333, 337 (1890)("[t]he rule of damages is the value of the property lost, and not the cost of replacement," and the measure for destroyed buildings is "the actual value of the property in the condition it was in at the time of loss, taking into consideration its age and condition, and not necessarily what it would cost to erect a new building"); *Dombrosky v. Farmers Ins. Co.*, 84 Wash.App. 245, 259, 928 P.2d 1127, 1136 (1996)(where insured had not incurred the additional cost of replacing the structure, payment of additional amount would be a windfall).

However, while an actual cost policy is designed to avoid placing the insured in a better position than he or she was in before the fire, a replacement cost policy allows for such a possibility because it is intended to allow the insured to replace the damaged building. *See Hess v. North Pac. Ins. Co.*, 122 Wash.2d 180, 859 P.2d 586 (1993)(replacement cost coverage is not limited by concept of indemnity and recognizes that obsolescence and deterioration are insurable risks); 12 L. Russ, *Couch on Insurance 3d* § 176:56 (1998)("Replacement cost coverage was devised to remedy the shortfall in coverage which results under a property insurance policy compensating the insured for actual cash value alone.").

Here, the policy defines replacement cost as the "cost to repair, rebuild or replace the damaged or destroyed part(s) of the building(s) without deduction for depreci-

ation." However, defendant's narrow interpretation of this clause—requiring only the payment of the cost to provide a building constructed to its prefire specifications rather than a functional replacement—conflates the separate concepts of replacement cost and reproduction cost:

> Reproduction cost is the estimated cost to construct, at current prices, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship, and embodying all the deficiencies, superadequacies, and obsolescence of the subject building.

> Replacement cost is the estimated cost to construct, at current prices, a building with utility equivalent to the building being appraised, using modern materials and current standards, design, and layout.

American Institute of Real Estate Appraisers, *Appraisal of Real Estate* ch. 15, at 351–52 (9th ed.1987); *see also Black's, supra,* at 349 ("replacement cost" defined as the "cost of acquiring an asset that is as equally useful or productive as an asset currently held").

Thus, nothing in the concept of "replacement cost" coverage limits plaintiff's recovery to the cost of restoring her house to its prefire condition.

2.

Regardless of the actual "replacement cost," however, the policy contains a limitation on the amount that will be paid. It provides that the amount paid for replacement cost is not to exceed the smallest of the cost for "equivalent construction for similar use on the same premises," the limit of the policy, or the amount actually expended.

Defendant contends that the "equivalent construction for similar use" limitation does not include the cost of rendering plaintiff's house habitable by complying with changed building codes, even if that amount is otherwise encompassed in "replacement cost," and that, in any event, plaintiff's recovery here is limited to the amount she actually expended on the modular home. We disagree with both contentions.

a.

■ Defendant contends that the restriction on replacement cost to "equivalent construction for similar use" clearly limits replacement cost coverage to reproduction cost. We disagree.

■ "[C]overage provisions in an insurance contract are to be liberally construed in favor of the insured to provide the broadest possible coverage." *Fire Ins. Exch. v. Bentley,* 953 P.2d 1297, 1300 (Colo.App.1998). While an insurer may exclude events from coverage, *see O'Connor v. Proprietors Ins. Co.,* 696 P.2d 282 (Colo.1985), the exclusion must be clear and specific. *See Bohrer v. Church Mut. Ins. Co.,* 965 P.2d 1258 (Colo. 1998). Only if the language of the exclusion is unambiguous will it alter the reasonable expectations of an insured. *See Principal Mut. Life Ins. Co. v. Progressive Mountain Ins. Co.,* 1 P.3d 250 (Colo.App.1999), *aff'd,* 27 P.3d 343 (Colo.2001).

Here, the limitation provides for the cost of "equivalent construction for similar use." The terms are not defined in the policy, but their meaning can be ascertained from common definitions. "Equivalent" is defined as "[e]qual in value, force, amount, effect, or significance" or as "[c]orresponding in effect or function; nearly identical; virtually identical." *Black's, supra,* at 561. "Use" is defined as "[t]he application or employment of something; esp., a long-continued possession and employment of a thing for the purpose for which it is adapted." *Black's, supra,* at 1540.

As the definitions of both "equivalent" and "use" include concepts of functionality, the plain meaning of the term "equivalent construction for similar use" includes maintaining the property's prefire function.

Prior to the fire, plaintiff's house was a habitable dwelling yielding rental income. Merely restoring it to its prefire condition would have rendered it uninhabitable and thus unfit for any similar use. Such a result does not comport with the plain language of the limitation or the reasonable expectations of an insured purchasing a replacement cost policy. *See Bering Strait Sch. Dist. v. RLI Ins. Co.,* 873 P.2d 1292 (Alaska 1994); *Starc-*

*zewski v. Unigard Ins. Group,* 61 Wash.App. 267, 810 P.2d 58 (1991).

Although defendant cites cases that have reached the opposite result—some interpreting "equivalent construction" to preclude the cost of building code upgrades and some finding the exclusion for building codes applicable—most of those cases involved policies that also included language that the insurer would pay replacement cost "without allowance for any increased cost of repair or reconstruction by reason of any ordinance or law regulating construction or repair." *See Bischel v. Fire Ins. Exch., supra,* 1 Cal. App.4th at 1174, 2 Cal.Rptr.2d at 578; *McCorkle v. State Farm Ins. Co.,* 221 Cal. App.3d 610, 270 Cal.Rptr. 492 (1990); *Breshears v. Ind. Lumbermens Mut. Ins. Co., supra; Bradford v. Home Ins. Co.,* 384 A.2d 52 (Me.1978); *Weinstein v. Commerce Ins. Co.,* 196 Va. 106, 82 S.E.2d 477 (1954); *see also Hewins v. London Assurance Corp.,* 184 Mass. 177, 182, 68 N.E. 62, 64 (1903)(amount paid "shall in no event exceed what it would then cost the insured to repair or replace the same with material of like kind and quality," and insurer was not liable "beyond the actual value destroyed by fire").

Here, however, no other language in the policy would negate the reasonableness of interpreting the "equivalent construction for similar use" limitation as contemplating similar functional utility and thus to include the cost of complying with regulations necessary to render plaintiff's house habitable.

b.

▓ We also disagree with defendant that it has paid more than required by the policy because plaintiff "actually expended" less on the modular home than the cost to repair the damaged house.

This is not a situation where plaintiff elected to spend less than the amount offered by the insurer. *See Huggins v. Hanover Ins. Co.,* 423 So.2d 147 (Ala.1982)(after insurer paid plaintiffs $85,000 actual cost and plaintiffs replaced the property with another home costing $79,000, they were not entitled to the replacement cost of $106,366.21); *Estes v. State Farm Fire & Cas. Co.,* 358 N.W.2d 123 (Minn.Ct.App.1984)(plaintiffs not entitled to offered replacement cost of $30,712 for slate roof when they spent $13,000 to replace the roof with different material), *modified en banc,* 365 N.W.2d 769 (Minn.1985).

Here, defendant insisted that it would pay no more than the cost of restoring the house to its prefire condition, $60,432.30. Thus, plaintiff could not repair her house to a habitable condition without making a significant expenditure for which defendant would not reimburse her, and she was left with the option of attempting to replace the house with the offered amount of funds. Filing an additional proof of loss that covered the building code upgrades would have been a futile act. Defendant may not rely on circumstances resulting from its own actions to deny coverage. *See Smith v. Mich. Basic Prop. Ins. Ass'n,* 441 Mich. 181, 490 N.W.2d 864 (1992)(insurer could not deny replacement coverage based on insureds' failure to repair or replace the property within the policy time limit when insurer's denial of the claim stood in the way of obtaining financing for repair or replacement).

Moreover, plaintiff did not choose to replace her house with a less expensive one. The record indicates that installation of the modular home involved expenses beyond the purchase price, including a foundation and installation of a septic system, which were required to render the modular home habitable. Thus, the purchase price of the modular home and the additional expenses appear to have exceeded the $60,432.30 offered.

III.

Plaintiff contends that she is entitled to the increased cost of complying with *all* of the upgrades required by the building code or, alternatively, that she was entitled to the limits of the policy because her house was a "total loss." We conclude that plaintiff is entitled only to replacement of the fire damaged portions of her house and that her house was not a "total loss."

A.

▓ Plaintiff contends that all of the required upgrades should be covered because

they would not have been necessary absent the fire and that her house would be uninhabitable unless they were completed. We disagree.

The policy and endorsements provide that replacement cost is limited to the cost of replacing the "part(s) of the building(s) damaged or destroyed."

Here, many of the required code upgrades appear to pertain to areas damaged by the fire. However, certain of the requirements, such as replacing part of the foundation wall that had been knocked out to allow access to the sewer line, apply to areas of "non-permitted construction" that apparently were untouched by the fire. Any code upgrades required in areas not damaged or destroyed by the fire would fall outside the replacement cost coverage.

Plaintiff's policy further provides:

> To determine replacement cost ... do not include the value of: 1) excavations; 2) underground pipes, wiring, and drains; 3) foundations and other supports below the surface of the lowest basement floor. If the structure does not have a basement, do not include the value of the preceding items which are below the surface of the ground inside the foundation walls. The cost of land is always disregarded.

Certain of the other required code upgrades may fall within these exclusions to replacement cost.

Thus, we conclude that plaintiff is not entitled to coverage for all of the required code upgrades and that further proceedings are required to determine which of the required upgrades are covered under the policy.

## B.

▓ Plaintiff contends that, regardless whether the policy includes coverage for the increased cost of complying with the building codes, the fact that she was not permitted to rebuild her house to its prior specifications rendered it a "total loss" and that because her house was "effectively, totally destroyed by the fire," she is therefore entitled to the policy limits. We disagree.

Plaintiff relies on cases where the insured could not repair or replace the damaged property because the building codes or zoning laws prohibited rebuilding under any circumstances. *See, e.g., Rutherford v. Royal Ins. Co.,* 12 F.2d 880 (4th Cir.1926); *Md. Cas. Co. v. Frank,* 85 Nev. 209, 452 P.2d 919 (1969).

Here, however, the county did not prohibit plaintiff from rebuilding her house. It merely required that she comply with current building codes—rendering repair more expensive, but not impossible. Thus, plaintiff's house was not a total loss under the asserted basis. We do not address whether the ultimate cost of repairing the damaged portions of the house to conform with building codes would exceed the policy limits.

## IV.

▓ Plaintiff contends that the trial court erred in granting defendant's summary judgment motion on her bad faith breach of contract action. We agree.

The trial court granted the motion based on its finding that the policy did not provide the claimed coverage. Given that we have reached the opposite conclusion at least in part, factual questions remain as to whether defendant acted reasonably in denying the claim.

The judgment is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

Judge JONES and Judge KAPELKE concur.